313 P.2d 327

**IDAHO FALLS BONDED PRODUCE &
SUPPLY COMPANY, a corporation, Plain-
tiff-Respondent and Cross-Appellant,**

v.

**Z. N. EGBERT and Louise Egbert, husband
and wife, Defendants-Appellants and
Cross-Respondents.**

No. 8347.

Supreme Court of Idaho.

June 28, 1957.

Holden & Holden, Idaho Falls, for appellant.

Albaugh, Bloem, Barnard & Smith, Idaho Falls, for respondents.

SMITH, Justice.

This case involves an appeal by defendants-appellants and cross appeal by plaintiff-respondent. The parties will be referred to as plaintiff company or plaintiff, and as defendants. The action became one of the general nature of an accounting between the parties.

April 26, 1950, defendants, farmers, residents of Fremont County, entered into a written contract of joint venture with plaintiff company. The contract had to do with the raising of a crop of "certified potatoes" during the 1950 growing season, on 150 acres of defendants' farm lands.

The contract, drawn by the president of plaintiff company provided that plaintiff advance certain sums to pay past due indebtedness of defendants; also, that plaintiff advance moneys needed during the growing season to pay certain expenses for the producing and harvesting of the crop; all such moneys so advanced to be secured by defendants' chattel mortgage.

Simultaneously with the execution of the contract, April 26, 1950, defendants executed and delivered their promissory note to plaintiff in the amount of $25,000, payable April 1, 1951, secured by a chattel mortgage encumbering the joint venture crop of 150 acres of potatoes, and defendants' crops consisting of 20 acres of barley, 140 acres of wheat, and 100 acres of alfalfa; also encumbering defendants' 22 head of cattle, 16 pieces of farm machinery and 3 motor vehicles. The chattel mortgage also secured further sums as may be advanced by plaintiff to defendants "for any purpose," including certain designated purposes, not to exceed $30,000.

September 2, 1952, plaintiff commenced action to foreclose the chattel mortgage,

alleging a balance of $11,314.49 principal sum owing on the note together with interest at 8% per annum from October 19, 1951.

Defendants by answer and counterclaim denied any indebtedness owing to plaintiff company on the note and mortgage, and alleged overpayment of the same. Defendants set out the contract and requested an accounting of the proceeds of the potatoes grown and delivered to plaintiff pursuant thereto, and of all proceeds received by plaintiff from the sale of the potatoes; also cross complained for judgment against plaintiff in the sum of $344.04 as overpayment on the mortgage together with 6% interest from October 15, 1951; also for judgment in such sum as may be ascertained by the accounting to be due defendants from plaintiff.

The court heard a portion of the matter sitting with a jury, who answered certain propounded interrogatories. The Court, at the conclusion of the hearing, entered judgment March 18, 1955, in favor of plaintiff and against defendants in the sum of $3,559.98, together with costs.

Defendants appealed and plaintiff cross appealed from the judgment.

Both parties question the trial court's construction of the contract of joint venture. Plaintiff company also questions certain accounting procedure followed by the trial court; also a finding to the effect that plaintiff failed to account for a quantity of the joint venture potatoes.

Defendants assign error of the trial court allowing plaintiff company $2,800 as a storage charge by reason of the storage of certain of the joint venture potatoes in plaintiff's potato cellar in Idaho Falls, and in charging that amount as an expense against the crop. Defendants also assign error of the trial court in allowing plaintiff company $10,564.55 as a handling charge on potatoes which it accounted for, and $5,893.10 as a handling charge on certain potatoes which the jury found plaintiff failed to account for, totaling $16,437.65, and charging such sum against the crop.

The contract recites that it "concerns a growing deal of approximately one hundred fifty acres of potatoes that are to be grown and cared for" on defendants' farm near Ashton.

Plaintiff company agreed to advance $17,848.62 to pay certain of defendants' past due indebtedness, and other money "needed throughout the growing season * * * in the growing of the crop of certified potatoes on approximately one hundred fifty (150) acres of land" owned by defendants, and for harvesting the crop. The advances to be made "for the growing and producing of crop" were for plowing, harrowing and preparing the land for seed bed; treating and cutting potato seed; fertilizer, planting, cultivation, irrigation, rogueing, and other unspecified expenses of producing and harvesting the crop.

Defendants were to furnish the 150 acres of farm land for growing the potatoes, the irrigation water, all equipment for handling the crop, and their services such as "cultivating, watering, harvesting, etc." They were to furnish the seed at $2.00 per cwt., their account to be credited for the total cost of the seed.

The contract then provided "all expenses incurred in the producing of this crop" will be charged against defendants and that when the "harvesting and selling of these potatoes take place" all sales will be credited to defendants' account; also that plaintiff company should have the exclusive right to sell and handle the potatoes.

The contract further provided, *"No expenses other than those mentioned herein shall be charged against the crop."*

■ The allowance of expense for storage of the potatoes to be paid from the proceeds of the venture does not appear provided for in the contract. The record shows, however, that the parties modified the contract in that regard. They discussed storage of the potatoes, the necessity therefor, and where the potatoes should be stored. They agreed that part of the potatoes would be stored in plaintiff's cellar in Idaho Falls, a part in defendants' cellar at Ashton, and a part in a commercial cellar at Chester. The expense of storage in the Chester cellar, paid by defendants, became a charge against the joint venture potato account.

The trial court therefore properly allowed plaintiff's claim for storage of $2,800, as a proper charge against the joint venture potatoes.

The trial court found that the handling charges made by plaintiff were for washing, sorting, grading, sacking and preparing for market the potatoes handled by plaintiff, stored in its cellar at Idaho Falls, as part of the necessary expense of producing and harvesting the crop.

■ Those "handling" charges were not made until the winter and early spring following the 1950 growing season during which the crop of potatoes was grown or produced and harvested; nor did defendants know that plaintiff company had made any such charges against such portion of the crop stored in plaintiff's cellar at Idaho Falls until after plaintiff had filed its action against defendants. Noteworthy, the record does not show that any handling charges were made against the joint venture potatoes sold at the instance of defendants from defendants' Ashton potato cellar or from the Chester commercial storage cellar.

Analysis of the contract shows that expenses were to be charged for growing, producing and harvesting the crop and that no expense except as mentioned in the contract was to be charged against the crop. Since the handling charges do not appear included within the purview of the contract as deductible expense, and in the absence

of an agreement between the parties that they be deducted, the said handling charges were improperly charged against the crop. Defendants' said assignments of error in that connection were properly taken.

Defendants next assign error of the trial court in holding that all net proceeds from the joint venture potatoes be divided between the parties prior to application of the net proceeds of the crop to payment of the sums secured by the chattel mortgage.

The contract provides that the "parties of the contract shall share and share alike on a fifty-fifty basis." The contract then provides, in mandatory language, "However * * * *the mortgage* * * * *shall be taken care of before any profits accrue to either party to this contract."* The effect thereof construed in conjunction with other provisions of the contract is, first, that all proceeds from the sale of the potatoes grown on defendants' 150 acres shall be used first, to repay all moneys advanced *"for any purpose"* by plaintiff to defendants, secured by the mortgage; and second, that the proceeds then remaining shall be divided equally between the parties. (Emphasis supplied.)

Further, the record shows that the president of plaintiff company, who drafted the contract, using such words of plain import, so explained the contract to defendants.

Defendant Mr. Egbert testified:

"A. Mr. Stanger [president of plaintiff company] read it and ex-plained it to us. He explained it to us. He explained it this way, that every-thing that we drew from the Bonded Warehouse would be charged to our account and everything—would be credited when potatoes were sold—the sales from the potatoes when they were sold, harvested and sold would be credited to our account."

" * * * * * *

"A. When the potatoes were sold this money would go to pay this $11,000 and $6,000 [defendants' prior indebtedness] and what moneys he advanced for the growing of this crop including the harvest expenses which he didn't know what it would be."

" * * * * * *

"A. Here's a paragraph * * * 'It is further understood and agreed that after all potatoes are disposed of parties of this contract shall share and share alike on a 50-50 basis. However, it is understood and agreed that parties of the second part [defendants] acknowledge the mortgage and that this shall be taken care of before any profits accrue to any parties of this contract.'"

"Q. * * * Was that provision of the contract explained to you by Mr. Stanger— A. Yes, sir.

"Q. —on the day you signed it? A. * * * Yes, after all these other

moneys was paid back then if there was a profit it would be split 50-50."

" * * * * * *

"A. We understood that the seventeen thousand—the eleven thousand, rather, and eight hundred dollars, and the six thousand, all the moneys that he advanced for the growing of this crop, the moneys for the harvesting, would all be charged to our account, and that when the potatoes were sold the money would be credited to our account, and what was left over, profit, it would be split fifty-fifty, and that there would be no other expenses charged to us other than what are in the contract."

Mr. Stanger's testimony appears when called in rebuttal:

"Q. Mr. Stanger you testified you drew the agreement? A. That's correct.

"Q. And you also testified that in this agreement that you drew that the agreement expressly provides that 'It is understood and agreed that parties of the second part acknowledge the mortgage and that this shall be taken care of before any profits accrue to either parties to this contract? A. That is correct."

" * * * * * *

"Q. (Mr. Barnard) * * * It simply says the mortgage will be paid before anybody divides any profits. A. That's right."

Mr. Stanger then testified that the potato venture, whereby plaintiff would advance the money for growing the potatoes so that the potato crop would be on a fifty-fifty basis, had no bearing on the loan of approximately $18,000 which plaintiff company made to defendants to take care of their other obligations; in that connection, however, the joint venture contract, drafted by the president of plaintiff company, expressly recites:

"It is hereby agreed and understood that this contract is in connection with mortgage that is to be given by parties of the second part [defendants] to party of the first part [plaintiff] for these moneys advanced [$6,000 and $11,848.62] and moneys to be advanced in the growing of crop of certified potatoes on one hundred fifty (150) acres of land on the farm owned by parties of the second part."

 An ambiguity in a written instrument is construed more strongly against the party who drew the instrument especially where one drawing the instrument is a lender of money. General Mills v. Cragun, 1943, 103 Utah 239, 134 P.2d 1089.

 The joint venture contract having been drafted by an officer and the president of plaintiff company, the principle of interpretation is applicable, that the words of a contract will be construed most strongly

against the party who uses them and who drafts the instrument. Hauter v. Coeur d'Alene Antimony Min. Co., 39 Idaho 621, 635, 228 P. 259; Stone v. Bradshaw, 64 Idaho 152, 128 P.2d 844; Morgan v. Firestone Tire & Rubber Co., 68 Idaho 506, 201 P.2d 976.

■ Defendants' said assignment is well taken. The trial court should have applied the net proceeds of the potato crop to payment of defendants' mortgage indebtedness and then divided the remainder between the parties. Two specific items thusly affected are, First, the sum of $340.67 which the trial court found defendants owed as the balance of defendants' indebtedness existing at or about April 1950, when the parties entered into the contract and defendants executed and delivered the securing chattel mortgage; and Second, the sum of $4,516.36 included in advances made by plaintiff to defendants, found by the trial court as used by defendants in operations other than the potato venture. The court made a fifty-fifty division of the profits, and then deducted those amounts, totaling $4,857.03, from defendants' share of the profits. The item of $340.67 should have been deducted from the profits before a division thereof. But the item of $4,516.36 already had been deducted by having been included in the amount of the advances charged against defendants; and all advances were subject to being paid by the credits to defendants' account, not only from proceeds of sale of joint venture potatoes, but from proceeds of sale of other chattels belonging to defendants encumbered by the mortgage, all of which proceeds plaintiff handled through one account with defendants.

Plaintiff, on its cross appeal, assigns error of the trial court in disallowing interest to plaintiff on the aforesaid item of $4,516.36. We deem such assignment without merit for reasons aforesaid.

■ Plaintiff assigns error of the trial court in finding in effect that under the terms of the agreement, advances made by plaintiff to defendants for purposes outside the joint venture should be charged to advancements under the note and mortgage.

Plaintiff's position is that the agreement contemplated two accounts, i.e., First, an accounts having to do with the loans secured by the chattel mortgage, made by plaintiff to defendants, thereby to enable defendants to meet their past due obligations and to carry on their farming operations outside the joint venture; and Second, an account having to do with the joint venture potato crop.

The contract does not make such a distinction, since it recites considerations of moneys advanced, namely the $6,000 to pay certain of defendants' indebtedness, and the $11,848.62 to pay defendants' then existent mortgage debt owing to a bank; the contract then recites the consideration of "other moneys which will be needed throughout the growing season which are to be advanced." The contract then sets out that it, the contract, is in connection with a mortgage to be

given by defendants to plaintiff, First, *"for all these moneys advanced,"* referring to the aforesaid moneys advanced and to be advanced, and Second, for "moneys to be advanced in the growing of crop of certified potatoes on approximately one hundred fifty (150) acres of land" on defendants' farm. Further, the mortgage secured advances made *"for any purpose."* The contract is not divisible as maintained by plaintiff; nor is the mortgage so divisible; the mortgage was intended to cover all advances made for whatever purpose.

Furthermore, some seventeen months after executing the contract, i.e., September 17, 1951, plaintiff company furnished defendants with a statement of the account, Defendants' Exhibit J, in which plaintiff made no segregation of accounts. Plaintiff company charged to defendants all advances made for any purpose, and credited defendants with all moneys which plaintiff received, for the use of defendants, from any source; Exhibit J, so evidencing the accounting method pursued by plaintiff, was in accordance with the express language of the contract and the mortgage; also, the exhibit corresponded to defendant Mr. Egbert's interpretation of the language of the contract; also corroborated his testimony of the explanation, made to him by plaintiff's president, of the meaning of the contract. Plaintiff's accounting method shows that plaintiff neither contemplated nor intended any distinction or segregation of various accounts, i.e., of mortgage ac-

count, of potato venture account, or personal account. Those various accounts showed up later when an accountant made those distinctions and segregations in his audit. Plaintiff's said assignment of error is *without merit.*

Plaintiff has assigned errors of the trial court relating to accounting practices followed in relation to defendants' receipts from sale of grain, handled by plaintiff. The trial court followed practices indicated by the stipulation of the parties relating to those receipts; also Defendants' Exhibit J, a statement of account which plaintiff furnished defendants, shows five of the six grain transactions, the last transaction having been consummated during October 1951, after plaintiff furnished said account. The court's accounting practices did not deviate from the practices indicated by said exhibit. Those assignments of error, therefore, are not supported.

Plaintiff lastly assigns error of the trial court in submitting to a jury the question of whether plaintiff had fully accounted for the potatoes and in adopting the verdict of the jury on such question.

The record shows that defendants were extremely dissatisfied with the grade of potatoes as plaintiff had reported the same to them. It was at defendant Egbert's instance that plaintiff made a test run on the balance of the potatoes, with plaintiff's employees, and equipment. The written report of the test was made to defendants by plain-

tiff's supervisor; and although plaintiff's foreman knew that the test was being run and knew its purpose, he claimed that the samples were not representative; nevertheless, plaintiff made no effort thereupon or thereafter to make a so-called "representative" run. It was proper to submit this issue to the jury for a finding; the jury's figures are supported by adequate and substantial evidence. Said assignment is without merit.

Lastly, defendants assign error of the trial court in failing to enter judgment in accordance with defendants' entitlements. Said assignment is properly taken.

Judgment should be in favor of defendants in accordance with the following:

| | | |
|---|---|---|
| Profits as found by the trial court, which reflect the deduction for plaintiff's storage charge of $2800 | | $12,863.93 |
| Charges deleted, to be reflected in the profits: | | |
| Handling charge on potatoes accounted for | $10,564.55 | |
| Handling charge on potatoes unaccounted for | 5,893.10 | 16,457.65 |
| | | $29,321.58 |
| Less, balance of advances owing | | 340.67 |
| Profits | | $28,980.91 |
| Division of Profits: | | |
| One-half to plaintiff | $14,490.45 | |
| Plus an amount to equal defendants' retention | 5,134.90 | |
| Plaintiff's share | | $19,625.35 |
| Defendants' share, the balance | | 9,355.56 |
| | | $28,980.91 |

No sufficient reason appears for the granting of a new trial inasmuch as the matter of settlement of the controversy is subject to mathematical computation as aforesaid.

The judgment of the district court in favor of plaintiff and against defendants is reversed and the cause remanded with instructions to set said judgment aside and thereupon to enter judgment in favor of defendants and against plaintiff in the sum of $9,355.56 together with interest thereon at the rate of 6% per annum from March 17, 1955, the date of the judgment appealed from, defendants to be allowed their costs incurred in the district court. Costs on appeal to defendants.

KEETON, C. J., and PORTER, TAYLOR and McQUADE, JJ., concur.